**Frederick A. REED, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 71S00–9704–CR–233.

Supreme Court of Indiana.

Dec. 3, 1998.

---

Susan K. Carpenter, Public Defender of Indiana, Gregory L. Lewis, Deputy Public Defender, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Carol A. Nemeth, Deputy Attorney General, Indianapolis, for Appellee.

SELBY, Justice.

A jury convicted Frederick A. Reed ("defendant") of murder,[1] and the trial court sentenced him to a term of sixty-five (65) years and ordered him to pay restitution. Defendant raises two issues in this direct appeal: whether the trial court erroneously shifted the burden of proof to defendant through its jury instructions; and, whether the trial court erred in denying defendant's motion to correct errors. Finding no reversible error with respect to either of these issues, we affirm.

---

1. *See* Ind.Code § 35–42–1–1(1)(1998).

## FACTS AND PROCEDURAL BACKGROUND

The evidence viewed in the light most favorable to the verdict is that, shortly after midnight on the morning of June 10, 1996, defendant, while in the presence of Larry "Omar" Campbell ("Larry") and with Troy Franklin ("Troy"), shot and killed James Gunn ("Gunn" or "victim") while Gunn sat in the driver's seat of his car. The shooting occurred after the victim had threatened Larry's wife Reverly. Larry was subsequently killed on June 26, 1996.

Patricia Campbell ("Campbell"), Larry's sister and an acquaintance of defendant and his girlfriend as well as the victim, testified at trial that a few days before Gunn's murder on June 10, Larry and Troy paid her fifty dollars ($50.00) to deliver one thousand two hundred fifty dollars ($1,250.00) to defendant as payment to kill Gunn. She also testified that, when the murder occurred, she had been visiting a friend who lived near the scene. She saw Gunn's car approach, and, after Larry hailed him, Gunn's car made a U-turn. Larry approached the car and pulled out a revolver. Defendant was in the front passenger seat of Gunn's car and had a gun. After Larry pulled out his revolver, according to Campbell, there was an "open fire" and "a lot of gunshot" which came from the inside of the car on the passenger side. (R. at 610.) The car lurched forward and crashed into some parked cars. Troy got out of the back seat of Gunn's car and helped defendant, who was not steady on his feet, get out of the front passenger seat. Defendant then ran off, and Troy Franklin and Larry also left the scene.

Campbell's testimony was corroborated in substantial part by other evidence. Residents of the area heard gunshots and the sound of a car crash. One woman looked out her window and saw a man exit the car from the passenger side and enter a house down the street. A neighbor saw a man running south from the scene. Another saw a man running in a bent-over fashion.

When police arrived at the scene, the car engine was still running, the window on the driver's side was shattered, the passenger's door was open, and there was a large crack on the passenger side of the windshield. Gunn was slumped over in the driver's seat. There were eight gunshot wounds to his head and neck, and, although these wounds came from two different guns, all were received from a range of not more than eighteen inches and were delivered from someone on the right or passenger's side of the victim's car. The victim's pager registered a call at 10:44 p.m. from defendant's phone number.

Reverly Campbell, Larry's wife, testified that, on the night of the murder, her husband came home agitated and panting as if he had been running. He told her to leave the room, and she did so, but heard defendant's voice in the other room. Later, her husband told her that if the police questioned her she was to say that he and Troy Franklin had been home all evening playing cards.

Reverly Campbell also testified that, when she saw defendant the next day, he told her that he had hit his head on the windshield and asked if the wound could be covered with makeup in the event that he had to talk to the police. When Detective Thompson questioned defendant later the same day, he noticed a bump and abrasions on defendant's forehead.

Michael Robinson, a cellmate of defendant's, also testified that defendant told him about the charges and made incriminating statements, including that he and Larry had shot Gunn, that the car had then moved forward, and that he had hit his head on the windshield of the car.

At trial, defendant denied killing Gunn, accepting money from Campbell to kill Gunn, and confessing to his cellmate that he shot Gunn. Defendant presented an alibi defense. He, his wife, and a friend testified that, although he had gone out with Gunn on the evening of the murder, he returned prior to the shooting and waited for a friend to come over and put up their miniblinds. Defendant, however, testified that Gunn did not come into his house while his wife was there, while his wife testified that Gunn did come into the house that evening. Defendant also testified that, while he was with Gunn, Gunn told him that defendant's wife had paged him. Defendant, his wife, and another friend

testified that defendant had hurt his head at a barbeque while moving a grill.

Defendant also presented the testimony of a neighbor, who after hearing the gunshots and crash, looked outside and saw a man running and a gray car in the area do a U turn. Defendant elicited testimony from a police officer that a gray Ford Tempo driven by Jerome Thomas and with a passenger named Willie Thomas had been stopped near the crime scene.

The State, however, established through the testimony of resident Willie Smith that Jerome Thomas drove Smith's son Willie home from work that night, and that Smith did not hear the gunshots and crash until after his son and Jerome had come home. After the crash, he saw someone who looked injured run past his house, but he did not recognize this person.

During closing argument, defendant argued that the occupant of a small gray car may have been involved in the shooting.

Although the proposed written jury instructions and the court's colloquy with the parties regarding those instructions are included as part of the record, the actual instructions as the court gave them orally to the jury are not a part of the record on appeal. The parties appear to agree, however, that, upon the close of evidence, the trial court gave the following instruction, which is included in written form in the record as State's Instruction No. 6 and which the prosecutor referred to in passing[2] during his closing argument: "Evidence connecting a party, other than the defendant, to a crime must do more than cast suspicion or raise a conjectural inference that the third party committed the crime; it must directly connect the third party to the crime." (R. at 91, 110; Appellee's Br. at 5–6; Appellant's Br. at 12.) Defendant did not object, although the

trial court specifically invited argument on that proposed instruction. Defendant simply requested that the court add a final sentence to the instruction stating that the burden of proof beyond a reasonable doubt never shifts to defendant.

THE COURT: ... Okay State's 6. I have not had a chance to review those cases recently; I assume that's what they say?

STATE: Yes.

DEFENDANT: I haven't had a chance to review those cases Judge. I don't know, I'm sure that they're all—

THE COURT: Well, I'm indicating my intent to give State's Exhibit 6[sic]. If there's any further record to be made on that in the morning, please let me know.

DEFENDANT: I would ask though that there be added to the State's instruction Number 6, a final sentence that would say, that the burden of proof beyond a reasonable doubt never shifts to the defendant.

STATE: I think we have covered that in the Court's general instruction on presumption of innocence.

THE COURT: I agree. I think it's covered by the Court's instructions, but I'm going to give 6.

(R. at 850–51.) There was no further colloquy on this instruction.

After the jury convicted defendant, he filed a motion to correct errors based on the discovery of new evidence. Approximately ten days after the jury convicted defendant, Patricia Campbell signed an affidavit recanting her trial testimony. Specifically, she stated that when she testified against defendant she had taken Darveset, Valium, and extra strength Vicaden; that at the time of the murder she had been under the influence of crack cocaine; that she did not see defendant in Gunn's car when Gunn was murdered;

---

2. The prosecutor argued:

The Court also is going to tell you that evidence connecting a party other than the defendant to a crime must do more than cast a suspicion or raise a conjectural inference that a third party committed the crime, it must directly connect the third party to the crime charged. So, and the reason for that is it's easy to throw up names. Could it be Sam Smith, Bill Smith, Judy Smith, and you have to

disprove every single possibility of every single name in the world, and that's not what the burden of proof is here. That's not what the State has to do. The State has to prove this man did it, and prove it by the evidence, and the evidence alone. Not by things we could speculate, but by the evidence you heard from that witness stand over the past three or four days.

(R. at 873–74.)

and that she testified against defendant because she had been convinced that he killed her brother Larry.

The trial court held a hearing on the motion. Defendant's evidence included Campbell's affidavit and the testimony of defendant's brother Percy Reed, Percy's girlfriend, and a friend, who testified that Campbell willingly went with Percy and Troy to sign the affidavit. The State presented both a sworn statement which Campbell gave to the police after she prepared the affidavit for defendant and her live testimony at the hearing itself. In the sworn statement, she testified that defendant's brother Percy and Troy threatened her and forced her to go to defendant's lawyer to prepare an affidavit recanting her trial testimony. She testified that when she tried to leave the office without signing the affidavit, Percy and Troy grabbed her and forced her to return and sign the affidavit. She was afraid that they would hurt her or her children if she did not cooperate. At the hearing, she testified that defendant had called her the day before signing the affidavit and told her that his people would give her anything as long as she said he was not in the front seat of Gunn's car. She also expressly testified that she had been coerced to sign the affidavit, and that, as she previously had testified in her sworn statement, her trial testimony had been truthful.

Richard Hamilton, a cellmate of defendant's, and Detective Thompson also testified for the State. Hamilton testified that defendant told him that he was going to give Campbell some cocaine to entice her to change her story, and that he was going to kill her when he got out of jail. Detective Thompson testified that, after the trial and while Thompson was at the jail interviewing Hamilton, defendant initiated a conversation with him and admitted that he, in fact, had been in the back seat of Gunn's car at the time of the killing. The defense presented nothing contradicting the testimony of Hamilton and Thompson.

The trial court denied defendant's motion to correct errors.

## DISCUSSION

### I.

Defendant argues that the trial court committed reversible error when it instructed the jury that "[e]vidence connecting a party, other than the defendant, to a crime must do more than cast suspicion or raise a conjectural inference that the third party committed the crime; it must directly connect the third party to the crime." (R. at 91.) He argues for the first time on appeal that this instruction had the effect of improperly shifting the burden of proof to defendant. Defendant, however, has waived this issue, not only because he failed to raise it properly below, but also because he failed to comply with Appellate Rules 7.2 and 8.3(A)(7).

To preserve for appellate review an issue regarding the propriety of a trial court's giving of a jury instruction, a defendant must comply with both Appellate Rule 7.2 and Appellate Rule 8.3(A)(7). Rule 7.2 places the burden on the appellant to present to the Court a record that is complete with respect to the issues raised on appeal, and this burden includes a duty to ensure that the Court has a transcript of the appropriate trial proceedings. A failure to provide a complete record may result in a waiver of the issue. *See Clark v. State,* 562 N.E.2d 11, 13 (Ind.1990); *Maisonet v. State,* 448 N.E.2d 1052, 1054 (Ind.1983).

Rule 8.3(A)(7) requires that "[w]hen error is predicated on the giving or refusing of any instruction, the instruction shall be set out verbatim in the argument section of the brief with the verbatim objections, if any, made thereto." *Id.* While Rule 8.3(A)(7) refers specifically to the need to include "objections, if any, made thereto," by implication it also requires the party challenging the propriety of giving an instruction to include a verbatim recitation of any colloquy the parties had with the court regarding any amendment to the instruction or any agreement to the giving of the instruction. Again, a failure to comply with Rule 8.3(A)(7) generally results in waiver of the issue. *See Richardson v. State,* 697 N.E.2d 462, 465 (Ind.1998); *Norris v. State,* 498 N.E.2d 1203, 1206 (Ind.

1986); *McCarty v. State,* 496 N.E.2d 379, 381 (Ind.1986).

These requirements are more than a mere formality. They play an important role in assuring that this Court has a complete and accurate record of what transpired before the trial court. In the context of jury instruction issues, the requirements ensure that the Court has a record of what the jury was actually instructed so that it may make informed decisions as to the propriety and the consequences of the giving or the refusing of any instructions.

■ Here, defendant failed to include as part of the record on appeal a transcript of the court's actual oral instructions to the jury. Moreover, although defendant included in his brief on appeal the verbatim text of the challenged jury instruction as the State submitted it to the trial court in writing, he did not include a verbatim recitation of the colloquy directly pertaining to that instruction and his request to amend that instruction. Accordingly, he has waived any argument as to the propriety of giving the challenged instruction.

■ Even if, however, defendant had complied with the appellate rules, defendant's argument cannot succeed because he did not properly preserve the issue below by making a clear and specific objection to the instruction, and because he cannot establish that the court committed fundamental error requiring reversal by giving the challenged instruction. *See Ben–Yisrayl v. State,* 690 N.E.2d 1141, 1150 (Ind.1997), *reh'g denied* (July 9, 1998), *pet. for cert. filed* (Oct. 7, 1998) (No. 98–

6397); *Barany v. State,* 658 N.E.2d 60, 64 (Ind.1995).

The State concedes that it was error to give the instruction because it was based on a standard for admissibility of evidence that has been superseded. *See Joyner v. State,* 678 N.E.2d 386, 389–90 (Ind.1997) (reversing a conviction after the trial applied this superseded standard and excluded evidence that another person may have committed the crime). The State, however, argues that the giving of the instruction does not constitute fundamental error. The State points out that the challenged instruction must be considered together with all of the other instructions referencing the State's burden.[3] *See Wrinkles v. State,* 690 N.E.2d 1156, 1161 (Ind.1997), *reh'g denied* (March 23, 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 148, 142 L.Ed.2d 121 (1998) (June 19, 1998); *Bonham v. State,* 644 N.E.2d 1223, 1227 (Ind.1994); *Reaves v. State,* 586 N.E.2d 847, 855 (Ind. 1992). The State maintains that the instructions in this case as a whole had a "clear and dominant statement and theme that the prosecution bore the burden" to prove defendant's guilt. *See Walker v. State,* 632 N.E.2d 723, 724 (Ind.1994)(distinguishing *Blackburn v. State,* 519 N.E.2d 554, 556–57 (Ind.1988)). The State concludes that the giving of the instruction could not have misled the jury and have had the effect of shifting the burden of proof from the State to defendant, and that, therefore, there was no fundamental error warranting a reversal of defendant's conviction. *See Collins v. State,* 567 N.E.2d

---

**3.** Although the court's actual instructions as given orally to the jury are not a part of the record on appeal, the written jury instructions submitted to the trial court and included in the record, include general instructions on the presumption of innocence and the State's burden of proving defendant's guilt beyond a reasonable doubt, as well as an instruction that the jury should "try to fit the evidence to the presumption that the defendant is innocent." (R. at 80, 104; Appellee's Br. at 7.) As to the alibi defense, the written instructions included in the record state that:

Once the defendant invokes an alibi defense, *the State has the burden to show beyond a reasonable doubt that the defendant was at the scene of the crime and knowingly committed the offense.* Once the State has met that burden, it need not directly rebut appellant's alibi evi-

dence, but may sustain its burden of proof by its evidence-in chief [sic] concerning the commission of the crime.

(Emphasis added; R. at 90, 111.) The record also includes the written alibi instruction submitted by defendant:

The defendant has asserted the defense of alibi. Evidence has been presented that at the time of the commission of the crime charged in the information the defendant was at a different place so remote or distant or that such circumstances existed that he could not have committed the crime.

*The State has the burden of disproving this defense beyond a reasonable doubt.*

(Emphasis added; R. at 94, 112.) The colloquy between the court and the parties seems to show that the court gave both alibi instructions.

798, 801 (Ind.1991); *Reid v. State*, 529 N.E.2d 1309, 1309–10 (Ind.1988).

The difficulty we have with the State's argument is that it requires us to consider the instructions as a whole when those instructions, as they were actually given, are not included in the record. Nevertheless, if all of the written instructions which relate to the burden of the State and which appear in the record, in fact, were given, and defendant makes no claim to the contrary, then the State's argument has merit.

Thus, we conclude that defendant has waived any error regarding the propriety of the challenged jury instruction and that any error pertaining to the giving of the challenged instruction does not warrant a reversal of defendant's conviction.

## II.

■ Defendant also argues that the trial court abused its discretion and committed reversible error when it denied his motion to correct errors, requesting a new trial on the basis of newly discovered evidence.[4] A new trial based on the discovery of new evidence is warranted only if defendant can show:

(1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial of the case; and (9) that it will probably produce a different result.

*Fox v. State*, 568 N.E.2d 1006, 1007 (Ind. 1991). *See also Lott v. State*, 690 N.E.2d 204, 211 (Ind.1997). Regarding the final and critical ninth factor, the defendant must raise a strong presumption that the result at any subsequent trial in all probability would be different. *See Nunn v. State*, 601 N.E.2d 334, 337 (Ind.1992); *O'Connor v. State*, 529 N.E.2d 331, 333 (Ind.1988). In ruling on whether a piece of evidence would produce a different result, the trial court "may properly consider the weight that a reasonable trier of

fact would give it and, while so doing, may also evaluate its probable impact on a new trial in light of all the facts and circumstance shown at the original trial of the case." *Fox*, 568 N.E.2d at 1007. Ultimately, the decision of whether to grant a new trial on the basis of newly discovered evidence is within the sound discretion of the trial court, and this Court will reverse the trial court only upon a showing that the court abused its discretion. *See Wright v. State*, 690 N.E.2d 1098, 1114 (Ind.1997); *Chiesi v. State*, 644 N.E.2d 104, 107 (Ind.1994).

■ There is no basis for concluding that the trial court abused its discretion in denying defendant's motion to correct errors. In fact, the trial court's decision seems eminently reasonable given the facts in this case. The only new evidence supporting defendant's motion to correct errors was Patricia Campbell's disavowed affidavit. Although her affidavit states that she offered perjured testimony at trial, and that she did not see defendant in the car with Gunn, Campbell subsequently testified in a sworn statement that her trial testimony had been truthful and that defendant's brother and Troy Franklin had coerced her into signing the affidavit. She also disavowed the affidavit at the hearing on the motion. Moreover, as stated above, the hearing revealed that there was new evidence that actually bolstered portions of Campbell's trial testimony. Detective Thompson testified at the hearing that, after the trial, defendant himself admitted that he had been in the car the night of the shooting. Thus, defendant effectively recanted the alibi defense he put forth at trial.

The trial court, after considering the disavowed affidavit and the other evidence in light of the nine factors set out in *Fox*, certainly could have concluded that defendant failed to produce new evidence that was credible, could be used effectively at a subsequent trial, and would probably produce a different result. *See O'Connor v. State*, 529 N.E.2d at 333. In fact, Detective Thompson's testimony, as newly discovered evidence, definitely supports the conclusion that a subsequent trial would produce the same result. The trial court, therefore, did not

4. *See* Ind.Crim. Rules 16 and 17; Ind. Trial Rule 59 (1998).

abuse its discretion when it denied defendant's request for a new trial.

## CONCLUSION

Accordingly, we affirm the judgment below.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.